Good morning, your honors, and may it please the court. My name is David John Hummel, and I represent Allison Mayfield. I will watch the clock and do my best to request four minutes for rebuttal. In this case, Allison Mayfield pled guilty to reckless driving under the advice of criminal counsel, and in court she had an ASL interpreter present to accommodate her deafness. She is not challenging that guilty plea. She has not pled fact that the plea was legal, involuntary or without factual basis. What she is challenging is the lack of meaningful access she received because the City of Mesa's police officers failed to accommodate her deafness with an ASL interpreter, beginning with a roadside stop. With that backdrop, this court should reverse and remand, beginning with the procedural bar under HEC. The primary reason why HEC does not apply is, one, this conviction derived from a guilty plea without evidence, not a verdict with evidence, and second, there are no facts pled that are inconsistent with guilt. With the HEC bar cleared, turning to the merits, this is a 12B6 motion to dismiss. There are plausible allegations and reasonable inferences in the record that Allison Mayfield required an ASL interpreter, and without one, she suffered a real hindrance in her ability to communicate. One of the best cases on point is this court's decision in Updike v. Multnomah in which this court said that whether an accommodation is reasonable is a fact-intensive enterprise. Specifically, the court was considering the provision of an ASL interpreter and said that an ASL interpreter, for someone whose primary and preferred means of communication is ASL, is akin to someone whose primary and preferred language is Spanish. In that sense, when someone is enmeshed in the criminal justice system or interacting with police officers, they would require an ASL interpreter, and that's why this matter should be sent to discovery. More so in Bax v. Doctors Medical Center of Modesto, this court stated that covered entities have affirmative obligations to accommodate those with disabilities. Now, you agree that we can, even in the context of a 12B6, we can consider the video evidence which is incorporated by reference into the complaint, correct? Yes, I agree. Okay. Are you familiar with the Ball, B-A-H-L case from the 8th Circuit, the Burkhall case from the 11th Circuit that specifically deal with the application of the ADA in the context of traffic stops? Not specifically, no, Your Honor. Okay. I mean, because we look for a circuit authority that is as close as we can get, and both of them deal with, you know, very analogous situations, and both of them reject the claims. So, for example, in the Burkhall case, the 11th Circuit said, in any event, the actual communication between Trask and Burkhall was not so ineffective that an oral interpreter was necessary to guarantee that Burkhall was on an equal footing with hearing individuals. Burkhall admits that he reads lips and usually understands 50% of what is said. In addition to verbal instructions, Trask gave physical demonstrations. During the traffic stop, Burkhall was able to respond to his directions about getting out of the car, providing his driver's license and insurance. While the communication may not have been perfect, Burkhall, by his own admission, understood that he was being asked to perform field sobriety tests. And then they conclude that Burkhall has failed to state an ADA claim regarding the field sobriety test during his DUI arrest. Why shouldn't we conclude the same here? This officer was very patient, as shown by the videos. She did everything that she could. She tried with the phone. She went and got paper. She really was — she was very respectful. She tried to make sure she was being understood, make sure, are you understanding? She'd get occasionally a thumbs up. I don't see, from this video, looking at that kind of authority from other circuits as persuasive, I don't see that this was not a reasonable accommodation. So tell me why you think that's wrong. Yes, Your Honor, and to start, let me retract. I am familiar with Burkhall. I've seen the name so many times. I've never had the pronunciation in my head. So I am familiar with that case. I think what Your Honor read is important, is that the Burkhall plaintiff preferred to communicate by lip-reading. And he had no allegations, I believe, at the summary judgment stage, that even though it was at a certain percentage, that he was deprived of anything in particular. By contrast here, in the excerpts of record, pages 76 to 78, we have allegations of the amended complaint that Ms. Mayfield did receive a real hindrance in her ability to communicate. For example, under the stressful circumstances of a roadside stop, he was shown a cell phone in low illumination, which he had difficulty reading. There's allegations where Officer Hall said, I'll explain as much as I can. And in 78 of the excerpts of record, there's allegations that Ms. Mayfield could not communicate with Officer Volz or his mother. And going to the body cam, Your Honor, this is a situation where Scott versus Harris comes into play. You cannot plead facts and ask us to take them as true when they are contrary to what is on the videotape. And I've watched this videotape, and it is apparent, viewing the transaction as a whole, the interaction as a whole, that there was substantial communication and understanding between them at all relevant and material points throughout the process. And the officer did everything she reasonably could on the scene in order to accomplish this as quickly as she could with the paper, shining the light on the paper. When the second officer arrived, he was able to assist in that. And I just, I don't see where in the video is there a breakdown in the communication that materially affected this interaction? Your Honor, I have two main responses. One, going in line with the 11th Circuit, there's an 11th information that he or she could not exchange or he or she could not hear, in the sense that because Ms. Mayfield is deaf, she could not hear certain things, so she didn't have to allege specifically what she did not hear. But second, going to your broader discussion, that would go more toward the deliberate indifference requirement. I don't think that goes to the reasonableness of the accommodation. If you look at the body cam, as soon as Officer Hall walks up to the car, Ms. Mayfield starts signing. She starts using American Sign Language to be specific. Then Officer Hall takes out a cell phone, tries to type back and forth. Even after a few minutes of doing so, Officer Hall still recognizes a real hindrance in communication because she attempts to call an officer who is familiar with American Sign Language. But what she never does, and what no officer ever does, is try to get a third-party, in-person interpreter or use video remote interpreting to accommodate Ms. Mayfield when we plausibly allege that it's available 24-7, 365. I think going to the body cam itself, we see repeated instances, and we have on page nine of our brief, where Officer Hall has a conversation with Officer Volz, where they have a miscommunication. Officer Volz says Ms. Mayfield said one thing. Officer Hall said she said something altogether different. And I think in viewing the fact that Officer Volz, who is used as a communication aid, who freely said he's super rusty on American Sign Language, he would need three years of schooling to gain his proficiency back, or the allegations in the complaint that he used his mother via cell phone and it was ineffective, that's enough at the 12B6 stage to send this matter to discovery and understand whether or not the failure to provide an ASL interpreter was reasonable under the circumstances. Certainly, we're not arguing that there were zero attempts at communication, but in looking at what was offered, typing on a cell phone, lip reading, making gestures, rudimentary finger spelling, as we put in our brief, those methods specifically for Ms. Mayfield would be ineffective. And many times, the Department of Justice or case law has said that they would be facially invalid under certain circumstances. And the standard review on that score is important, Your Honor, because we have plausible allegations both in the complaint and we have the body cam footage showing that Ms. Mayfield was not on equal footing in terms of communication. She did not have the full panoply of information that other arrestees would have in which she could express herself, ask questions, and do things of that nature. And I think that goes back to the fact that there are these statutes with the affirmative obligation, as this court said in Bax, that there are federal regulations that lawfully implement that statute, that create a duty for covered entities like the city of Mesa to provide accommodations. There's been no rebuttal to the idea that even VRI for a roadside stop, let alone for a DUI processing facility, would be a reasonable accommodation for someone on the scene when police officers are interacting with one person or another. The statute and the regulations empower covered entities like the city of Mesa to investigate and have accommodations ready for individuals with disabilities like Ms. Mayfield when she's at a roadside stop. And the body cam footage itself spans well over an hour. Once again, there was no effort, no attempt whatsoever, as far as we know right now, that there was a request for a third-party interpreter. And that's one of the errors of the district court decision in which the district court said sua sponte that this would impose an undue burden. There's no allegations in the amended complaint or any document incorporated by reference that would support such a standard. We put that in our brief that's in the complaint. And overall, Your Honor, I think one thing to underscore is the fact that Ms. Mayfield, her disability, is known or obvious. So I know there's some jousting back and forth with the parties in terms of requests was made. I would assert based on the complaint in which we've alleged a request, and given the fact that the body cam is not a complete depiction of events, there's certain footage that we don't have, for example, conversations with Officer Boltz's mother. There's obviously only certain perspectives. We don't know exactly what was typed out on text messages. We don't know what Ms. Mayfield was attempting to communicate without the benefit of an interpreter. So whether we take those allegations plausibly in Ms. Mayfield's favor, certainly there's enough in there to show that Officer Hall, for instance, knew an ASL interpreter would be required. Because even after texting back and forth, that's when a few minutes later she called dispatch to try to find another officer. Counsel, what would be your position if your client spoke a dialect or a language that was rare in the world? How would you apply that to this scenario here? Your Honor, that would go to the reasonableness of the accommodation. If she speaks a rare dialect, and that's something that the City of Mesa could not procure, whether, again, it's in person or through video remote technology means. But I will say, given the advent of VRI or video remote interpreting, there is a wide range of possibilities of what could be accommodated. So I think that would be a fact-specific inquiry that would be best suited for discovery as well. But certainly here, given the prevalence of American Sign Language, and as we even put, this isn't just an allegation standing in the vacuum. Police departments throughout the country are using VRI to interact with deaf and hard-of-hearing individuals, that this is a reasonable accommodation, especially at the 12B6 stage. And if there are no further questions at this time, I will reserve my final minutes for rebuttal. All right. Thank you, Counsel. Thank you. Good morning, Your Honors. Christina Retz for the City of Mesa. May it please the Court. Counsel, would you respond to the idea that this is really a reasonable accommodation concept and that it's not really a 12B6 decision, and that we should allow some discovery and see what happens either on summary judgment or at trial? Well, Your Honor, I think we would have to first set aside the heck portion of this case, which I believe bars these claims. But in addition... What if I don't agree with that? Let's jump... If you don't agree with that, then turning to Scott B. Harris, we have to take the body camera as it stands. And those facts which are established in the body camera show that there was effective communication and that there was no real hindrance, and that, in fact, Ms. Mayfield was treated more favorably than other arrestees. Some facts that the plaintiff doesn't address in the context of looking at this case is that the ADA is very context-specific. Our Supreme Court in Sheehan took petition for certification to address whether the ADA, Title II, even applied to the circumstances of an arrest and whether there could be vicarious liability against the agency and declined to address that because the parties didn't brief it. So it shows... Well, we're kind of stuck with Sheehan on that, aren't we? Because the Supreme Court took that issue, and then the city, for whatever reason, sort of gave it away, and they then dismissed the issue. So that panel decision stands. It stands, but I still believe that it stands for the proposition that this context is very important. And the context here is that we are New Year's Day at 9 p.m. in the context of an arrest, and the accommodations need to be seen through the body camera lens, through that context. So if we look at BACS, BACS is a case that's very helpful, I believe, to this analysis, where the court found that ASL interpreters on site were not required. And, in fact, there were issues with the VLR. So the VLR allegation does not end the inquiry. In fact, the plaintiff did not address that in the district court briefing below. Their complaint contains a single allegation about the VLR, and the CFRs have specific requirements about VLR. So that the VLR is a technology that exists does not mean that it was available in this instance. You need to have a contract with the VLR company. You need to have a dedicated, high-speed Internet connection. So we're coming back to the context. Sotomayor, this goes back to Judge Fitzwater's question. Now you're getting into sort of a lot of contextual detail. And it's striking to me that in the cases that seem to be most relevant, even though no one mentioned them in the briefs, which are the Ball case and Burkhall, and then there's a Fourth Circuit case called Rosen, all of them arise on summary judgment. And the defendant wins on summary judgment, but that's because there's a record where all this sort of detail gets set out, and then you can make the assessment. Here we just have the videos and the allegations of the complaint, and that's it. And that — is that really enough to give you judgment as a matter of law just on the pleadings on that video? Yes, Your Honor, because there's not facts that are going to change and make this more favorable for the plaintiff. Instead, the facts — You just, in your own argument, have identified considerations that are not covered that might be relevant to the balance. But I see, Your Honor, that those are within the record on the body camera. We know the date that the stop occurred. We know what time the stop occurred. We know all of the efforts that the officer made to communicate. We know that the plaintiff herself is the one who first suggested writing by note-taking. So the additional facts that come out during discovery are, does Ms. Mayfield regularly communicate through note-taking, communications, that way? That would make the city's argument even better. So you have an exact transaction of what occurred on the body camera. In a lot of these cases, like BACs, you have credibility determinations to be made. You have testimony about what did or did not occur. Here we have a video. We can read the questions that were written to Ms. Mayfield on the paper. So on Exhibit 1 — Well, to follow up, counsel, my understanding from the brief of the opposing party is that there are examples given of three or four municipalities that had this. So wouldn't that also be something that comes into play? And wouldn't that be in addition to what's in the pleadings? It could be, but that's not the inquiry under — that's not the test. The test is effective communication. The CFRs do not require VLR. The DOJ guidance and toolkit that the plaintiff cites to from 2007, which is very old and doesn't really take into perspective current technology, including here, the attempt to use FaceTime, that didn't work. There's no real hindrance in the communication here. You know, first of all, we could go to the Miranda piece of it. There's no right of a suspect to have Miranda read to them out loud. And, in fact, finding that there was an issue with giving a Miranda warning would run contrary to the Supreme Court's decision in Vega v. TICO, which found that there could not be a Miranda violation claimed by a 1983 suspect because it's a procedural prophylactic rule. So we take that piece out. And then if we are looking next to the consent forms, because the plaintiff brings up the supposed miscommunications about the consent forms, that inured to Ms. Mayfield's benefit. In Arizona, we have a statute that talks about informed consent for DUI. It is written on the consent form. If you do not agree to a blood draw after being arrested, you can lose your license for 12 months. So by Officer Hall going through and giving the printed form, she adequately and fully allowed Ms. Mayfield to read that form and understand that so she could consent. On the plea portion for the hack, I would just like to mention that the terms of the plea agreement for the reckless driving specifically incorporate the DUI. The terms of the plea require drug and alcohol testing. They require certification that she had not had drugs and alcohol. So that's just one of the conditions that was going to be part of the sentence. But the factual basis for the charge in the plea agreement seems to be all conduct that occurred before the stop. Well, I would submit by the conditions of the It's reckless driving. She wasn't driving once she was stopped. So everything that occurs during the stop is not reckless driving. But the reckless driving occurs because of the marijuana consumption. So you never get to any of the further portions of this field sobriety testing. But it has to be necessary in order to trigger the heck bar. And it seems that there's an ample factual basis. Even if everything had been suppressed, there was an ample factual basis based on, you know, the erratic driving that had been observed before. And none of that can be touched by a motion to suppress or anything that's at issue here. And so it doesn't necessarily call into effect. And so, heck, tell me why you think that's wrong. But that's where I'm struggling with, heck. So the reckless driving, think of someone who was texting or think of someone who had a medical emergency or something that would negate the mens rea. So the citation doesn't happen merely for the reckless driving. The additional investigation happens and then the arrest happens because of the information that occurs through those transactions. And you see Officer Hall's statement on the question, the specific question asked is, I would like to do some tests to make sure you are safe to drive. Is that okay? So there's clearly an indication here that the reckless driving is related to, and that's at Exhibit 1, at 1524, you can see the written questions that were on the but it shows the state of mind in stopping her, why she stopped, the context of it being New Year's Day, and that this all forms one unbroken chain of events here. And there's some public policy considerations here as well. Is that she's pled down to a lesser charge, which is a lesser included charge. It was not originally charged as reckless driving. It was originally charged as DUI and then pled down. So you have the potential of discouraging these conciliatory agreements to try to resolve cases without trial to a benefit that benefits the criminal suspect and or the plaintiff in this case. And Your Honor, I do believe that Burkhall is directly on point to this case. But in fact, the circumstances in this case are even more compelling given what occurred. We have multiple attempts at all different kinds of accommodations. The primary consideration argument made by the plaintiff, it is just a burden shift. And if there is effective communication, then that is met. We have effective communication here. We have effective communication in the form of gesturing, note-taking, texting back and forth. You can hear on the video that Officer Hall switches to the notepad because she was making typos, and she wanted it to move more seamlessly, more quickly with the note-taking, which the plaintiff herself. What if we had someone who spoke a rare language? What would happen? Because your argument seems to be based on the facts of this case that there was effective communication. What if we had one where there's not? What's the burden on the municipality in terms of providing that kind of interpreter? Well, you would go into whether it was an undue burden or not. You would focus more on that portion of the inquiry. But speaking a foreign language isn't a disability for purposes of the ADA, is it? No. So it wouldn't be relevant to an ADA claim. It would not be relevant to an ADA claim. And there's a portion of the ADA statute that I think is important here, too, is the ADA excludes direct threat. So where in this stop does the accommodation need to happen, assuming that the Sheehan analysis applies and that the Supreme Court wouldn't find differently? Because the ADA doesn't apply where there's a direct threat. And we know that Officer Hall was concerned that there was a direct threat to the public in pulling Ms. Mayfield over and in doing field sobriety tests to make sure that she was safe to drive. It's obvious from this video that the officer did not feel threatened in the slightest by Ms. Mayfield. She left her alone for significant periods of time in the car. There was actually the video shows a fair amount of trust between the two of them. So the threat issue is just not there. Not a physical threat, Your Honor. Okay. The direct threat to the public by allowing Ms. Mayfield potentially to get back in the vehicle, because the statute, the CFRs that talk about direct threat are not specific to physical threat. I completely agree with you that Ms. Mayfield was not a physical threat. The issues surrounding getting an ASL interpreter, moving quickly, determining what communication was going to happen are focused on the direct threat to the community itself. By Ms. Mayfield potentially being under the influence and then driving while under the influence. Because the issue is, if it's a reckless driving, is it a sight and release? If it's a sight and release, is she permitted to get into that vehicle again and drive and potentially harm the public? So you have all of these issues which are set forth on the body camera. We have these facts for which the court can determine if there was effective communication, if there was a real hindrance in the exchange of communication, and if it would have been an undue burden on the city in order to procure in person an ASL interpreter or the VLR, which the city didn't have in place at that point. The fact of the existence of it doesn't mean that it was available to the city at that moment. There is nothing in the case law that requires an ASL interpreter. In fact, in Updike cited by the plaintiff, Updike specifically talks about the fact that an interpreter may not be needed in every situation. And Updike is very factually dissimilar because you have an individual in jail in the conditions of confinement without eviscerating evidence. So you have an ability to plan, contact people, obtain ASL interpreters, push off court hearings, which is what in fact happened in Ms. Mayfield's criminal case, that they were able to push those court hearings later. You don't have that here. So you're trying to look at what was the effective communication? Was it different than what the hearing would have received? And I would submit that Ms. Mayfield received more favorable treatment. She was handcuffed in the front. She was able to read the instructions for the field sobriety testing, which is not done for everyone. The field sobriety testing was underlined for her. The officer then acted out the field sobriety testing so that Ms. Mayfield could know how to do the field sobriety testing. She was handcuffed in front, which is not something that would be done for officer safety. She was not taken to jail. And she was driven home, driven to a friend's house, apologize, by Officer Hall. So these are all circumstances indicating that she wasn't discriminated against intentionally. Instead, she was accommodated. She was given written forms. And she did sign those forms. And very critically, is nowhere in the complaint do we have any facts about what she didn't understand. And the idea that she cannot tell us is belied by the body camera. She could cite to specific portions of the body camera to say, I didn't understand this information. Understand that I'm out of time. Thank you. Thank you, counsel.  Yes, Your Honor. I'll focus on two main points. First, the facts. And second, just a brief final word on the HEC bar. Beginning with the facts, I think it's important to emphasize that this is a 12B6 case. Judge Collins, you referenced cases like Burke Hall. There's cases like Updike that come at the summary judgment standard. This may be a reasonable minds may differ after discovery in terms of whether or not she had a real hindrance. But based on the allegations in the complaint and the body camera footage, we have enough to send it to discovery. Again, in looking at the body camera as summarized on pages 28 to 29 of the opening brief, for example, there are statements from Officer Volz who was used as an accommodation saying that he's super rusty. There's also that colloquy between Officer Hall and Officer Volz. There's also a statement from Officer Hall saying, I used to be able to sign a little bit, but, you know, it's not fair to her to not get a full understanding. What's the legal standard? I mean, is the existence of various hiccups and, you know, problems at particular points, is that enough to establish an ADA violation? Or do we look at the overall course of the interaction and see whether or not, you know, there was an adequate level of comprehension that she really ultimately was not treated differently from a hearing person? Yes. I have two main points, Judge Collins. First, under effective communication or real hindrance, a gist is not enough. It has to be equal. It doesn't have to be merely successful. I mean, for example, there's nothing in the case law that has to be- So does equal mean every word has to be understood? And anything shorter? I'm just trying to understand what you're claiming is the legal standard. Sure. No, it doesn't have to be a blow-by-blow, word-for-word account, but certainly Ms. Mayfield should have the opportunity to ask questions, to participate, as someone would have if they didn't have a disability of deafness and needed an ASL interpreter to have that back-and-forth communication. We see that borne out in the body cam, and I think the focus from my friend on the other side is maybe the city of Mesa got the information they needed, but Ms. Mayfield, as alleged in the complaint, didn't convey or was able to participate in the way she needed. Effective communication is a two-way street, allowing both sides to fully communicate back and forth. And in addition to what's seen on the body cam- So in what respect was she not able to communicate back? What are the specific allegations as to what supports that contention? Sure. So with the amended complaint, I would specifically focus on Exhibits of Record, pages 76 to 78. For example, on page 78, there is that allegation that she had ineffective communication when interacting with Officer Volz and also with Officer Volz's mother, who was on the phone. Those are things where Officer Volz's mother is not depicted on the body cam. We also do not see Allison Mayfield, many times her facial interactions or what she's even signing when she's back and forth with Officer Volz. It's mostly from Officer Hull's perspective, looking at Officer Volz directly. But in addition, Judge Collins, when you focus on the different methods, that would go more toward deliberate indifference in whether or not the city of Mesa is liable for compensatory damages, whether or not they had an idea that there was a likelihood of harm to a federal right and a failure to act upon it. But I would say merely the existence of multiple attempts, when those attempts in and of themselves are ineffective, doesn't matter. I mean, the effective communication analysis we have is we look at rudimentary fingerspelling here in the case. We have texting back and forth. We have an officer who's super rusty on ASL. Merely because they attempted things without taking a single moment to try to request an ASL interpreter, be it in person or if they had VRI available, that's enough. And I will say I can't see the clock on my screen, so I hope I'm not abusing the time. You're over time, but I have a question for you. So the focus of the ADA is to allow those who are disabled to be able to access the services. That's the focus, the services that are provided to the public. And so what was she unable to access through this encounter? So she was able to get through the process. So how was she deprived of access? Your Honor, she was deprived of access merely because she was physically present and aware and participating. And because she hasn't alleged a bad outcome, such as the guilty plea wouldn't have been entered or she was wrongfully arrested in these circumstances, the fact that she's not able to participate as another person would is the access. For example, we see her on the body cam sitting by herself. There's people chattering in the background. If she had an interpreter, she could communicate more. And that's something that she could testify during the discussion. People who are not hearing impaired are sitting in a car alone. When I got stopped by an officer, I'm sitting in the car alone. The officer goes back to the car to check to see if I'm a criminal. And I'm sitting there waiting to see what happens. So how is that different than happens to people that are not hearing impaired? Your Honor, it's different because Allison Mayfield never had a choice. Without an ASL interpreter, we believe- I didn't have a choice either. I didn't have a choice either whether or not to sit there in the car and wait for the officer to check whatever he needed to check. I didn't have a choice either. And I'm not hearing impaired, but I still had the same experience. Well, Your Honor, what I would say for Allison Mayfield in particular, looking at the body camera without an ASL interpreter, which is her primary means of communication, which, as this court said in Updike, creates genuine issues of material fact. At the summary judgment stage- Of what? Material issues- She could not- What? Regarding if there was a real hindrance in her ability to communicate back and forth. Again, the police officer- So, for Ian, though, the difficulty is, in my opinion, you're divorcing the purpose of the statute from her discomfort with the process. So if there is a reasonable accommodation, there is no violation of the ADA. And that's the point. The fact that she wasn't able to communicate in the preferred method is not necessarily a violation of the ADA. Your Honor, I just have two quick points because I know I've been over time. What I would say is going to, for example, the Fifth Circuit's decision in Luke, which is on page 15 of our reply brief, the Fifth Circuit made clear, for example, that there's no need to allege a bad outcome, that the lack of meaningful access in and of itself is a harm. But that's the issue I have with your argument. There was not a lack of meaningful access because she was accommodated to the point that she could get through the process, even though it wasn't ideal. It doesn't have to be ideal. It just has to be that there's an opportunity through accommodation for her to reach the same outcome that a hearing- a person who is not hearing impaired would have. And Judge Rawlinson, what I would say is- this goes to the second point I was going to make. For example, the Bax case. That was a deaf couple that went to a hospital. There was no requirement from this court or any court I'm aware of that if you have a deaf person going to a hospital, that they need to allege medical malpractice. Simply the fact, even if they have the same bill of health, the same medical treatment they would have had, but for their deafness, that doesn't matter. What matters is that in Bax, for example, because they didn't receive interpreters, they allege that they suffered a real hindrance in their ability to communicate. The difference, and it's what all these circuit cases, which nobody cited, all emphasize, is that a roadside stop presents exigent circumstances, particularly if there's a suspected DUI, where time is of the essence. And I would add that there's a constitutional obligation under Rodriguez to complete a traffic stop without undue expenditure of time. And those are factors that distinguish it from a hospital situation where there might be more time. And so the reasonableness needs to be assessed in that different context. And it does, Your Honor, but that's when looking at the amended complaint and having no allegation that if the officers would have attempted to get an interpreter, much in the same way Officer Hall radioed for backup, saying, could I have an officer with sign language? And if I don't, I'll just take a regular one. She could have made the same call to her dispatch to say request an interpreter, or she had the means to request an interpreting agency herself. So with VRI as well, with that allegation that's available 24-7-365, that wouldn't infringe on the stop. And what I would say as a broader matter, we not only have the roadside stop, we have Ms. Mayfield's transport to a DUI processing facility. Throughout this entire encounter that spanned well over an hour, there's no allegation that they were unable to get an interpreter or they tried to do so. That's a matter for discovery. Certainly, if they could proffer faxing that they tried, or if they would have tried, they wouldn't have gotten one, then that would be very favorable for their case. But we don't have that right now. So without evidence of undue burden, I ask this court to reverse and remand. Thank you very much. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case as argued is submitted for decision by the court. That completes our calendar for the morning. We are in recess until 9.30 a.m. tomorrow morning. Thank you.
judges: RAWLINSON, COLLINS, Fitzwater